IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-CV-1015-MSK-CBS

**MINDY ARMSTRONG,**

    Plaintiff,

*v.*

**THE ARCANUM GROUP INC.,**

    Defendant.

---

**OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment (**# 27**), the Plaintiff's Response (**# 30**), and the Defendants' Reply (**# 32**). For the following reasons, the motion is granted in part.

## I. JURISDICTION

The Court exercises jurisdiction under 28 U.S.C. § 1331.

## II. BACKGROUND[1]

Defendant Arcanum Group Inc., called TAG by the parties, is a contractor that provides professional staffing to federal agencies. In this matter, TAG had a contract with the Bureau of Land Management (BLM), a component of the Department of the Interior (DOI). The contract provided, among other things, that the "Government may withdraw a previously issued approval or assignment of Contractor personnel to this contract and direct that the individual be removed

---

[1] The Court recounts the facts in the light most favorable to Ms. Armstrong, the nonmoving party. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002). In large part, the parties do not dispute the material facts.

from the contract based upon the individual not meeting Government expectations or requirements for personal, professional, or performance standards." # 27-2 at 15. This contract is subject to a global clause that allows either TAG or the BLM to demand an "interpretation of contract terms." # 30-5 at 1.

Plaintiff Mindy Armstrong was employed by TAG. Pursuant to the contract described above, she was placed by TAG as a Lease Administrator at the BLM. Ms. Armstrong prepared reports of the BLM's portfolio of leases for its Real Estate Leasing Services team. Her BLM supervisor was Terry Baker and her TAG supervisor was Steve Cota.[2]

The BLM leases land from both private entities and the General Services Administration (GSA). Some leases are based upon usable square feet, others upon rentable square feet. The difference is unimportant except that, at one time, the GSA provided in a *Pricing Desk Guide* that leases measured by usable square feet should be converted using a "global conversion factor" to measurements basted on rentable square feet.

Ms. Armstrong determined that the GSA failed to include the conversion factor in a subsequent *Pricing Desk Guide,* which made it inconsistent with a 2007 Department of Interior policy. Ms. Armstrong therefore reasoned that the updated *Pricing Desk Guide* superseded the 2007 DOI policy, leading her to the conclusion that the BLM was incorrectly calculating its leased footprint in two ways — (1) by using the conversion factor when it should not (thus inflating the total square feet in its portfolio); and (2) by excluding space that it received at no cost from its lessors, a practice the *Guide* did not authorize.

---

[2] Ms. Armstrong asserts that Barbara Burns-Fink, a TAG contractor working with her also was a supervisor. There is evidence that Ms. Burns-Fink had seniority relative to Ms. Armstrong, but not that Ms. Burns-Fink had supervisory authority or responsibility.

The BLM asked Ms. Armstrong to prepare two specific reports that included information regarding BLM leases, both of which would be used in requests to the DOI for funding of additional personnel. One report was designed to show the value of expiring leases (Lease Expiration Report) and the other was designed to show the costs that the BLM was willing to reduce over the upcoming 20 years to justify additional positions (Cost Avoidance Report).

Because these reports did not comport with her understanding of how the square footage of the leases should be calculated, Ms. Armstrong believed the reports to be based on false information.[3] Ms. Armstrong told Ms. Burns-Fink that the leasing services team was "falsifying data" and Ms. Baker responded that there was nothing fraudulent about the team's calculation of the lease data. After additional back-and-forth, Ms. Baker decided that Ms. Armstrong should be removed from the project. She emailed the BLM contracting officer, Tina Hamalak, stating that Ms. Armstrong should be removed from her contract assignment for "extremely poor performance" which was outlined in an attached justification which included the incident at issue as well as other performance issues. Ms. Hamalak, in turn, notified Mr. Cota at TAG that the BLM wanted Ms. Armstrong "terminated" from the BLM assignment because she was "not working out". He pressed for an explanation, but Ms. Hamalak was not willing to answer questions. Mr. Cota removed Ms. Armstrong from the BLM assignment. Because TAG had no other assignments for Ms. Armstrong, TAG terminated her employment.

Five days later, Ms. Armstrong filed a complaint with the Department of Interior Inspector General in accordance with 41 U.S.C. § 4712. The Department of Interior Inspector General

---

[3] TAG argues that the Court should disregard an affidavit submitted by Ms. Armstrong with her response that describes these two reports as a "sham affidavit." The Court need not resolve this dispute because even with the information contained in the challenged affidavit, Ms. Armstrong has not presented evidence to sustain either of her retaliation claims.

failed to act on the complaint within 210 days, and pursuant to statute, Ms. Armstrong then filed her Complaint with this Court.

Her Complaint (# **1**) is brought solely against TAG. In it, she alleges three claims: (1) retaliation in violation of the False Claims Act (FCA): (2) retaliation in violation of the enhanced whistleblower provisions in the National Defense Authorization Act (NDAA); and (3) common-law wrongful discharge (both violation of public policy and retaliation) under Colorado law. TAG has moved for summary judgment on all claims.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P.

56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV. DISCUSSION

### A. Retaliation Under the False Claims Act

31 U.S.C. § 3730(h)(1) provides that any employee who is discharged "because of lawful acts done by the employee in furtherance of an action under this section or other efforts to stop one or more violations of" the False Claims Act may bring suit. To make a *prima facie* showing of retaliation under the FCA, a plaintiff must come forward with evidence that (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew about such protected activity and took an adverse action against the employee; and (3) the plaintiff's protected activity was the but-for cause of the adverse action. *See Schell v. Bluebird Media LLC*, 787 F.3d 1179, 1187 (8th Cir. 2015).

The Eighth Circuit stated in *Schell* that the causation element is satisfied if the protected

activity is a motivating factor in the adverse action decision. In 2013, however, the Supreme Court held that the proper standard of causation for Title VII is but-for causation. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); *accord Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1296 n.9 (10th Cir. 2013). Though the Tenth Circuit has yet to apply this holding to the FCA retaliation analysis, the Fifth Circuit has recently done so. *See U.S. ex rel. King v. Solvay Pharm. Inc.*, — F.3d —, 2017 WL 4003473 at *8 (Sept. 12, 2017). The Court agrees, particularly given that the statutory phrase "because of" connotes a more stringent causal connection than "motivating factor" does.

Courts have applied the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), to retaliation claims under the FCA.[4] *See, e.g.*, *Diaz v. Kaplan Higher Educ. LLC*, 820 F.3d 172, 175 n.3 (5th Cir. 2016); *Harrington v. Aggregate Indus. Ne. Region Inc.*, 668 F.3d 25, 31 (1st Cir. 2012). Under this framework, a plaintiff must establish a *prima facie* case of retaliation and, if successful, the defendant must then articulate a legitimate, nondiscriminatory reason for taking an adverse action against the plaintiff. The plaintiff must then produce evidence such that a reasonable fact finder could find the explanation to be pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981).

TAG argues that Ms. Armstrong cannot establish a *prima facie* case because her opposition to the BLM's practices did not constitute protected activity within the meaning of the FCA and because her conduct was not a motivating factor in the decision to terminate her.

---

[4] The Tenth Circuit has yet to confront the applicability of *McDonnell Douglas* to either the FCA or NDAA, but it has implicitly approved of such burden shifting in an FCA retaliation case. *See U.S. ex rel. Erickson v. Uintah Spec. Servs. Dist.*, 268 F. App'x 714, 717 (10th Cir. 2008) (unpublished).

*1. Adverse Action*

It is helpful to begin with isolating the adverse employment action at issue. As to this, the parties disagree. Ms. Armstrong argues that the adverse action in this case was her removal from her assignment at the BLM; TAG contends that the subject adverse employment action was its termination of Ms. Armstrong's employment. The Court agrees with TAG.

Assuming, without deciding, that the BLM's decision to remove Ms. Armstrong from working on its projects is an adverse action, it would be actionable only if Ms. Armstrong sued the BLM. But here Ms. Armstrong sues only TAG and offers no basis upon which TAG is liable for the BLM's decision.[5] Thus the only adverse action subject to this suit is TAG's termination of Ms. Armstrong's employment.

*2. Causation*

Although causation is usually addressed as the third element for which a plaintiff must offer evidence, its analysis flows readily from the determination of the adverse action. Because the adverse action is TAG's termination of Ms. Armstrong's employment, to make a *prima facie* showing, she must come forward with evidence that her protected activity was the but-for cause of her termination by TAG. *See Nassar*, 133 S. Ct. at 2528.

---

[5] Ms. Armstrong does not allege that TAG can be held liable for the removal as a joint employer. *See Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc) (allowing joint liability if the employers "co-determine the essential terms and conditions of employment."). Nor could she, as TAG did not co-determine her contract assignment with the BLM; the BLM determined it in its sole discretion. Instead, she argues that the TAG-BLM contract contains a procedural mechanism for TAG to challenge her removal from the assignment, apparently surmising that, because TAG did not avail itself of the mechanism, it assumed the BLM's retaliatory motive in terminating her employment. But this contractual provision merely provides for TAG to seek an interpretation of contract terms; it does not contain any meaningful way for TAG to police or otherwise verify the BLM's justifications for directing removal. To investigate or verify the BLM's reasoning, TAG would need a mechanism for information gathering or fact finding, not a mechanism for a legal interpretation.

Ms. Armstrong contends that her criticism of the calculation of the BLM's leases for purposes of the reports was protected conduct. Again, assuming, without deciding, that such conduct was protected, Ms. Armstrong has failed to come forward with evidence to show that her statements caused her termination by TAG. There is no direct evidence that Mr. Cota knew of the statements that she made at the BLM when he terminated her employment with TAG. Indeed, Mr. Cota speaks to what he knew prior to making his decision to terminate Ms. Armstrong's employment with TAG: "So apart from the client instructing you to remove her and apart from there being no other positions to place her in, did you have any other reasons on October 3, 2014, for terminating Ms. Armstrong? No." Cota Dep. 18:8–13.

The only information Ms. Armstrong offers as to Mr. Cota's knowledge is speculative. She insinuates that Ms. Burns-Fink may have apprised Mr. Cota of her conduct at the BLM because Ms. Burns-Fink and Mr. Cota communicated about personal and routine events. In the same vein, she asserts that Ms. Hamalak could have told Mr. Cota because it is unlikely she would refuse to answer questions about Ms. Armstrong. Ms. Armstrong also argues that Mr. Cota was a "cat's paw," who uncritically relied on statements made by Ms. Burns-Fink, "a biased subordinate". The problem with these theories is that there is no evidence, only speculation, that anyone told Mr. Cota what Ms. Armstrong had said about the lease calculations.[6] This is not sufficient. *See Dusenberry v. Peter Kiewit Sons Inc.*, 2007 WL 1346598 at *9 (D. Colo. May 8, 2007).

---

[6] Ms. Armstrong contends that Mr. Cota must have learned about her conduct at the BLM prior to their termination meeting because he testified he was performing research about some "questions that Mindy had asked." But this, too, is speculative. It is not reasonable to infer from the fact that Ms. Armstrong had asked questions that Mr. Cota was aware of Ms. Armstrong's accusations against BLM personnel. Even with such an inference, the fact of Mr. Cota's research does not come close to establishing that he terminated Ms. Armstrong's employment *because of* her accusations.

In the absence of evidence that Ms. Armstrong's activity at the BLM was the reason that Mr. Cota terminated her employment at TAG, she has failed to establish a *prima facie* case of retaliation.

### 2. *Protected Activity*

The Court also has substantial doubt that, as a matter of law, Ms. Armstrong's statements about the calculation of square footage for BLM leases constitutes protected activity under the False Claims Act. The FCA concerns itself with actions that constitute fraud on the United States. There are two types of protected conduct: (1) an action by an employee in furtherance of a *qui tam* action or assistance in an FCA action; and (2) other efforts to stop an FCA violation. 31 U.S.C. § 3730(h)(1).

The first category requires that an employee put her employer on notice that she is "either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *McBride v. Peak Wellness Ctr.*, 688 F.3d 698, 704 (10th Cir. 2012). Such notice may take a variety of forms, from "informing the employer of illegal activities that would constitute fraud on the United States," to "warning the employer of regulatory noncompliance and false reporting of information to a government agency," to "explicitly informing the employer of an FCA violation." *Id*. However, "merely informing the employer of regulatory violations, without more, does not provide sufficient notice." *Id*.

As to FCA suits, the Tenth Circuit has not announced a standard defining "action in furtherance of." The consensus among the courts of appeal is that such action minimally requires that a plaintiff be investigating matters that reasonably could lead to a viable FCA case. *See Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004), *abrogated on other grounds by*

9

*Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998); *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996). This standard evolved from one where the touchstone is whether FCA litigation is a distinct possibility.[7] *See Childree v. UAP/GA AG CHEM Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996); *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994).

The second category of conduct extends protection to steps taken to remedy misconduct through methods such as internal reporting. *See Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015); *Halasa v. ITT Educ. Servs Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012). However, there still must be some nexus between the reporting and exposing of a fraud. *Mikhaeil v. Walgreens Inc.*, No. 13-14107, 2015 WL 778179 at *7 (E.D. Mich. Feb. 24, 2015). Given that there need not ultimately be an FCA violation for retaliation to occur, the Fourth and Sixth Circuits have incorporated an objectively-reasonable-belief standard to determine whether the employee's conduct is protected. *See Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 172 (4th Cir. 2016) (unpublished); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399–400 (6th Cir. 2015) (unpublished). Under this standard, a plaintiff must have an objectively reasonable belief that the conduct she opposes violates the FCA. The Court will discuss each category of protected activity in turn.

As an initial matter, the only "false claim" identified by Ms. Armstrong would be the

---

[7] At least the Eighth and Ninth Circuits have used Title VII's retaliation standard — asking whether the plaintiff had a good faith and objectively reasonable belief that the defendant was committing fraud against the government — to elucidate whether a plaintiff was investigating matters that reasonably could lead to a viable FCA action. *See Schell*, 787 F.3d at 1187; *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845–46 (9th Cir. 2002). The Seventh Circuit has also used this standard in addition to asking whether an FCA action was a distinct possibility at the time of investigation. *See Fanslow v. Chicago Mfg. Ctr.*, 384 F.3d 469, 479–80 (7th Cir. 2004). The Court does not see any need to import Title VII's standard because the viability standard is sufficient on its own.

BLM's request for more personnel in connection with the expiring leases based on the Lease Expiration and Cost Avoidance Reports. Although the Court appreciates that Ms. Armstrong believed the methodology used was incorrect, the Court has doubt that the request constitutes a "claim" under the FCA.

A "claim" is defined as any request or demand for money or property to be spent or used on the government's behalf if the government "provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A). Courts have generally construed "claim" to encompass a demand for payment from the government, falsely asserting an entitlement to government money that it is not obligated to pay out. *See, e.g.*, *United States v. McNinch*, 356 U.S. 595, 599 (1958); *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys. Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011); *Costner v. URS Consultants Inc.*, 153 F.3d 667, 677 (8th Cir. 1998). Furthermore, the Court can also find no instance where a government agency has ever tendered a false claim unto itself.

The Court has some doubt that the reports prepared by Ms. Armstrong support a claim for payment of government money. It is not clear that a request for more staffing is a "demand for payment" from funds of the United States. Most claims addressed by the FCA are made by third parties seeking payment from the United States Government, not one department or agency seeking an allocation of appropriated funds for a particular purpose. Ms. Armstrong offers no case law for the proposition that a request for additional staffing constitutes a claim for purposes of the FCA, and the Court has found no authority for such proposition. Assuming that a request for staffing conceptually could be a claim, it is not clear that this request actually is a claim. The request could just as easily be a request for a change in allocation of already appropriated funds, or a recommendation/projection connected with long-range planning pertinent to appropriation in the

11

future. Ms. Armstrong concedes that she does not even know if the purported claim was ever submitted to the DOI.

Assuming that the request is a claim, there arises a different problem. For Ms. Armstrong's conduct to be protected, it must have had a specific connection to an FCA action, either brought by the government or a *qui tam* action. Clearly, she was not assisting in an FCA action. Indeed, she does not identify any FCA action that was being investigated or that could be brought. A potential relator like Ms. Armstrong is unable to bring an FCA claim against a government defendant because the United States, in essence, would be suing itself. *See Greene v. IRS*, No. 08-CV-280, 2008 WL 5378120 at *6 (N.D.N.Y. Dec. 23, 2008); *Prevenslik v. USPTO*, No. 05-CV-498, 2005 WL 6047270 at *1 (E.D. Va. June 16, 2005). It is well established that such suits are non-justiciable. *See, e.g.*, *Sweeney v. FDIC*, 116 F.3d 942 (D.C. Cir. 1997) (table); *Juliano v. Fed. Asset Disposition Assoc.*, 736 F. Supp. 348, 351–53 (D.D.C. 1990). FCA claims against the government are frivolous. *See Turner v. U.S. Dep't of Educ.*, No. 15-CV-424, 2015 WL 4757055 at *2 (S.D. Cal. Aug. 10, 2015); *Prevenslik*, 2005 WL 6047270 at *1.

Similarly, the Court finds that she has not established that her conduct would be protected as "other efforts" to remedy misconduct under the FCA. The "objectively reasonable" test applies here. As noted earlier, although Ms. Armstrong may have been correct that the accounting method used for the BLM leases was in error, she had no "objectively reasonable" belief that such conduct violated the FCA. The record does not reveal any belief by Ms. Armstrong that the FCA was being violated, but even if one infers from her critique that she held such a belief, it was not reasonable because the government cannot sue itself.

Accordingly, under either category of § 3730(h)(1), Ms. Armstrong has not established that her conduct was protected under the False Claims Act. Consequently, this claim must be

dismissed.

## B. Reprisal Under the National Defense Authorization Act

Ms. Armstrong's second claim is based upon the National Defense Authorization Act. The NDAA prevents a government contractor from discharging an employee in reprisal for disclosing information that shows a violation of law, rule, or regulation related to a federal contract." 41 U.S.C. § 4712(a)(1)–(2). To establish retaliation under § 4712, a plaintiff must come forward with evidence showing that (1) she was an employee of a government contractor, (2) she disclosed information that she reasonably believed was evidence of a rule violation related to a federal contract to the required person,[8] and (3) her disclosure was a contributing factor in the action taken against her.

The NDAA does not follow *McDonnell Douglas*, but incorporates a similar framework into the statute itself by borrowing from an administrative-law statute. 41 U.S.C. § 4712(c)(6) provides that the legal burdens in 5 U.S.C. § 1221(e) shall be controlling for any judicial determination of whether retaliation occurred. § 1221(e), in turn, requires that an employee show her protected activity was a "contributing factor" in the employment action taken unless the agency (contractor for our purposes) "demonstrates by clear and convincing evidence that it would have taken the same personnel action" without disclosure. Thus, the questions asked are similar, but the NDAA collapses the *McDonnell Douglas* stages into a single question that the employer can only surmount with clear and convincing evidence as opposed to a preponderance of the

---

[8] The statute enumerates the persons to which a disclosure can be made. As relevant here, Ms. Armstrong must have disclosed information to either a federal employee "responsible for contract or grant oversight or management at the relevant agency" or a management official of the contractor "who has the responsibility to investigate" misconduct. 41 U.S.C. § 4712(a)(2)(D), (G).

evidence.

TAG argues that Ms. Armstrong cannot establish any NDAA reprisal because her opposition to the BLM's practices did not constitute protected activity within the meaning of the NDAA. Ms. Armstrong responds that her conduct concerned rule violations related to BLM leases which are government contracts. The Court agrees with TAG.

Ms. Armstrong's reliance on the NDAA is misplaced. The NDAA and its anti-reprisal provisions pertain only to contracts between the federal government and private contractors, not contracts between the BLM and other governmental agencies. The operative section of the NDAA is § 4712 entitled "Enhancement of contractor protection from reprisal for disclosure of certain information." It is found in Chapter 47 of Title 41, which contains miscellaneous provisions governing the relationship between federal agencies and private contractors. *See* 41 U.S.C. §§ 4701–12.

Although § 4712 is relatively new and the Court can find no case law applying or interpreting it, it is clear that § 4712 was enacted to enhance the protections of § 4705 of the Act, entitled "Protection of contractor employees from reprisal for disclosure of certain information." § 4712 does not define the term "federal contract", but § 4705 clearly does — it is the contract awarded by the head of an executive agency to a contractor. The contractor is the person to whom the contract is awarded. 41 U.S.C. § 4705(a)(1)–(2). Thus, the protections of § 4712 and § 4705 apply to conduct involving a disclosure of rule violations related to contracts between the federal government and private contractors. In this case, that would be the contract between TAG and the BLM. Because Ms. Armstrong's comments were not direct at that contract, but instead intra-government contracts, she has no claim under the NDAA.

Because the NDAA is not applicable in this context, the claim is dismissed.

**C. Wrongful Discharge**

Common-law wrongful discharge is a state-law cause of action. Having dismissed the federal claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (**# 27**) is **GRANTED** as to the Plaintiff's retaliation claims under the FCA and NDAA. Both Claims are **DISMISSED, with prejudice.**[9] The Plaintiff's wrongful-discharge claim is **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction under 28 U.S.C. § 1367.

Dated this 25th day of September, 2017.

**BY THE COURT:**

Marcia S. Krieger
United States District Court

---

[9] Because neither claim can be pursued as a matter of law and there has been no proffer of allegations that can address the deficiencies in the showing, the Court is disinclined to allow amendment of the Complaint.